T.C. Memo. 2016-139

UNITED STATES TAX COURT

AMERICAN METALLURGICAL COAL CO. AND SUBSIDIARIES, Petitioner
v. COMMISSIONER OF INTERNAL REVENUE, Respondent

HEIMDAL INVESTMENT COMPANY, INC., Petitioner
v. COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 21198-12, 25543-13.          Filed July 25, 2016.

Derek B. Matta, for petitioners.

Nina E. Chowdhry, Carol Bingham McClure, and Russell Scott Shieldes,
for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

COHEN, Judge:  In these consolidated cases, respondent determined
deficiencies, penalties, and additions to tax as follows:

[*2] American Metallurgical Coal Co. and Subsidiaries, Docket No. 21198-12

| Year | Deficiency | Penalty sec. 6662(a) |
|---|---|---|
| 2007 | $3,761,314 | $752,263 |

Heimdal Investment Company, Inc., Docket No. 25543-13

| | | Additions to tax | | |
|---|---|---|---|---|
| Year | Deficiency | Sec. 6651(a)(1) | Sec. 6651(a)(2) | Sec. 6656 |
| 1995 | $275,193 | $61,918.43 | $68,798.25 | $27,519.30 |
| 1996 | 344,006 | 77,401.35 | 86,001.50 | 34,400.60 |
| 1997 | 415,361 | 93,456.23 | 103,840.25 | 41,536.10 |
| 1998 | 306,664 | 68,999.40 | 76,666.00 | 30,666.40 |
| 1999 | 666,721 | 150,012.23 | 166,680.25 | 66,672.10 |
| 2000 | 180,000 | 40,500.00 | 45,000.00 | 18,000.00 |
| 2001 | 180,000 | 40,500.00 | 45,000.00 | 18,000.00 |
| 2002 | 340,342 | 76,576.95 | 85,085.50 | 34,034.20 |
| 2003 | 180,000 | 40,500.00 | 45,000.00 | 18,000.00 |
| 2004 | 180,000 | 40,500.00 | 45,000.00 | 18,000.00 |
| 2005 | 478,908 | 119,727.00 | 119,727.00 | 47,890.80 |
| 2006 | 180,000 | 45,000.00 | 45,000.00 | 18,000.00 |
| 2007 | 2,168,979 | 488,020.28 | 542,244.75 | 216,897.90 |
| 2008 | 50,515 | 11,365.88 | 12,628.75 | 5,051.50 |

**[*3]** Unless otherwise indicated, all section references are to the Internal Revenue Code (Code) in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

The remaining five issues for decision are:

Docket No. 21198-12

(1) whether American Metallurgical Coal Co. and Subsidiaries (Norse Group) is entitled to deduct a purported interest expense of $7,229,930 for the 2007 tax year and if so, whether it is entitled to a net operating loss (NOL) deduction for that year; and (2) whether the Norse Group is liable for an accuracy-related penalty under section 6662(a) for the 2007 tax year;

Docket No. 25543-13

(3) whether Heimdal Investment Company, Inc. (Heimdal), is liable for 30% withholding tax on the gross amounts of distributions it made to a foreign entity from 1995 through 2008; (4) whether Heimdal is liable for the failure to file addition to tax under section 6651(a)(1) for tax years 1995-2008; and (5) whether Heimdal is liable for the failure to deposit addition to tax under section 6656 for tax years 1995-2008.

**[*4]**                                     FINDINGS OF FACT

The stipulation of facts and the accompanying exhibits are incorporated herein by this reference.  At the time their petitions were filed, the Norse Group's and Heimdal's principal places of business were in Texas.  Although the Norse Group formally began filing returns on a consolidated basis in 1995, we use the term "the Norse Group" to mean AMC and its subsidiaries, past and present.

The Norse Group comprises the American Metallurgical Coal Co. (AMC) and its subsidiaries, which include Heimdal.  AMC is a domestic corporation that is indirectly wholly owned by Jan Petter Roed, a Norwegian shipowner who has a background in shipping and ore transportation.  The focal point of these cases is a transaction between Heimdal and Lausanne Energy, Inc. (Lausanne), a Liberian corporation, that took place over the course of tax years 1995 through 2008, the years in issue.

Brief History of Lausanne and the Norse Group's Business Relationship

Lausanne and the Norse Group have a business relationship that dates back to 1984.  Since 1984, a current Norse Group subsidiary, Norse Services, has provided management services to Lausanne and acted as Lausanne's agent in the United States.  In 1984, Lausanne purchased a company, Heimdal Investment Co. N.V. (Heimdal NV), that was formerly a member of the Norse Group.  At that time

[*5] Heimdal NV was an original investor in Caithness Geothermal 1980, LTD (CG), a domestic privately held partnership and independent power producer based in southern California. CG developed, owned, managed, and operated geothermal projects in that region under power purchase agreements with Southern California Edison Co. In 1986, Lausanne made a direct investment in CG by contributing $1,080,000 to the partnership in exchange for three limited partnership units.

In 1986, AMC was a general partner in a domestic partnership called Allied Minerals. That year, it granted two banks a security interest in the distributions it received from Allied Minerals. In 1987, AMC's parent company underwent a reorganization in response to the termination of the United States-Netherlands Antilles tax treaty. At the time AMC's president, Torgeir Mantor, consulted with Robert Pfaff, a partner at KPMG, about the tax aspects of the reorganization. The purpose of the reorganization was to "ensure the preservation of net operating loss (NOLs) carry forwards for possible future use." As a result of the reorganization, AMC lowered its tax burden and generated substantial NOLs, but it was still subject to the security interests held by the banks, in particular Den norske Bank (DnB).

**[*6]**   AMC incorporated Heimdal in 1987 as a domestic holding company of Lausanne's interests.  Heimdal's first director was Hans Rinderknecht (H. Rinderknecht), a Swiss lawyer who had previously represented Lausanne in negotiations concerning its 1984 services agreement with Norse Services.  In 1987, H. Rinderknecht was also the director of Lausanne.  His son, Dr. Thomas Rinderknecht (T. Rinderknecht), was Lausanne's managing director for the years in issue.

Leading Up to the Transaction Between Heimdal and Lausanne

In 1991, distributions from CG caused Lausanne to turn a profit, and it became liable for U.S. income tax, specifically the branch profits tax, which it paid via withholding in that year.  Later that year T. Rinderknecht initiated discussions with Mantor over how to make changes to Lausanne's investment in CG because income from the CG partnership had "grown to be substantial" and Lausanne might face "branch profits taxation problems."  T. Rinderknecht asked Mantor to reach out to tax experts about restructuring Lausanne's investments to reduce the potential tax exposure.  Mantor contacted Pfaff and apprised him of Lausanne's situation.  He also told Pfaff that the Norse Group had an interest in participating in some way.

**[*7]** On November 21, 1991, Pfaff mailed a preliminary letter to Mantor proposing that Lausanne contribute its CG partnership interest to the Norse Group in exchange for shares and possibly debentures. Pfaff believed the proposal would appeal to Lausanne because the Norse Group's NOLs "would shelter the income in all likelihood" but expressed concern that "the security agreement with the bank" would make his proposal unlikely to be implemented.

In the fall of 1992, the parties further discussed restructuring Lausanne's investment in CG for tax purposes. On December 10, 1992, Mantor faxed a proposed diagram of the Norse Group to T. Rinderknecht. The fax cover sheet advised T. Rinderknecht that DnB was a creditor of the Norse Group and had agreed only to hold a security interest in a newly formed subsidiary company, "Newco", which would hold AMC's coal properties. Therefore, Mantor believed that DnB would "not be in a position to attack any assets other than what is held in this company." Mantor's diagram identified that AMC would be the parent company of Heimdal, Newco, and AMC's other subsidiaries. The diagram also identified Lausanne, as the holder of a security interest with respect to Heimdal, and Newco, as the Norse Group subsidiary that "[o]wns coal properties and has bank debt".

[*8]   On December 11, 1992, Pfaff mailed a letter to Mantor and T. Rinderknecht outlining the tax impacts of a proposed sale of Lausanne's CG partnership units to Norse Services.  In the letter Pfaff indicated that Lausanne would transfer its CG partnership interest in exchange for a note with principal due upon maturity.  He suggested that the terms of the note call for the payment of fixed interest at an assumed rate of 12% over a term (not to exceed seven years) and additional interest whereby Lausanne would share in excess "cash flow".  He assumed a maximum purchase price of $5 million for the CG partnership interest and suggested that Lausanne perfect a security interest in the CG partnership units such that in the event of a default by the Norse Group subsidiary, Lausanne would have first deed on the partnership interest.  Pfaff determined that the transaction would be characterized as an installment sale for tax purposes and that Lausanne would defer recognition of gain on the sale of its CG partnership interest until Lausanne recovered the note's principal.  He stated that this was the case regardless of the fact that section 897 would classify the CG partnership interest as a U.S. real property interest and possibly subject Lausanne to withholding tax under the Foreign Investment in Real Property Tax Act (FIRPTA).  Pfaff also concluded that the interest paid to Lausanne would be considered "portfolio interest", free from withholding taxes under section 871(h).  He concluded his

[*9] letter by stating that in order for the sale to proceed, several tasks would have to be completed, including applying for an exemption so that the FIRPTA withholding tax rules would not apply, and that the parties should "evaluate very carefully the economic value of the partnership interest to negotiate an arm's length sales price."

On December 17, 1992, Mantor sent Roed a cashflow analysis which he believed showed "the tax benefits" of the transaction. Mantor stated that the analysis was a "quick draft" that was "based on some information which needs to be discussed with Lausanne." In the analysis he compared the after-tax profit to the Norse Group "with reorganization" and the after-tax profit to Lausanne "without reorganization" for the period 1992-2000. The analysis assumed that total distributions from CG would be $8,514,819 from 1992-2000 for both scenarios. He believed that he had a pretty good idea of what the cashflow and income would be from CG because he had access to all of CG's documentation pursuant to the services agreement between Lausanne and Norse Services.

The analysis assumed that the Norse Group would give a note payable to Lausanne worth $5 million "@ 12% interest only for seven years" and an "[e]quity kicker of 45-50% of [the] remaining cash flow." The analysis projected how the Norse Group's NOLs and expected interest expenses to Lausanne would offset

[*10] anticipated distributions from CG. In the end the analysis projected a total after-tax profit for the Norse Group of $1,573,813 "with reorganization" and a total after-tax profit for Lausanne of $3,337,809 "without reorganization". In projecting the after-tax profit to the Norse Group "with reorganization", the analysis assumed that the Norse Group would pay to Lausanne 79% of the total distributions from CG. The analysis did not provide for the Norse Group's repayment of the principal of the note to Lausanne.

At some point during this time, Lausanne and the Norse Group agreed that the transaction regarding the CG partnership units would be between Lausanne and Heimdal. On December 21, 1992, T. Rinderknecht faxed a letter to Mantor and Pfaff regarding the sale of Lausanne's CG partnership interest to Heimdal. In the letter T. Rinderknecht stated that he had spoken with Jim Bishop of Caithness Corp. (CC), the general partner of CG. Bishop was the president and CEO of CC, and he assured T. Rinderknecht that CC would cooperate with Lausanne and the Norse Group on the transaction. Bishop believed that in the foreseeable future the limited partners of CG, like Lausanne, would be taxed for distributions only up to their net capital investment and that thereafter all distributions to the partners would be tax free. He advised T. Rinderknecht to contact CC's tax adviser regarding this assessment and before selling Lausanne's partnership interest. T.

[*11] Rinderknecht requested that Pfaff contact CC's tax adviser to verify whether it was true that Lausanne would not face adverse tax consequences if it retained the CG units for a while. T. Rinderknecht also insisted that in the event Lausanne were to sell its CG partnership units to Heimdal, Lausanne retain an option to repurchase the units from Heimdal. T. Rinderknecht insisted on an option period of "not less than 15 years" and that Lausanne should be able to repurchase the units for a price "consisting of the purchase price paid by Heimdal increased by a certain margin for Heimdal."

On December 22, 1992, Mantor faxed a memorandum to Roed regarding "Norse Restructuring". The memorandum outlined the background, structure, tax considerations, and risk factors of two transactions. The first transaction was a continuation of AMC's 1987 reorganization and involved a new AMC subsidiary's owning of assets that had been previously owned by two AMC affiliates. This new subsidiary would assume and be responsible for all of the bank debt associated with the assets and would join in AMC's consolidated return. As a result of the restructuring, Mantor believed that AMC would be able to use a combined NOL of approximately $20 million. The second transaction involved Heimdal's purchase of Lausanne's CG partnership units. Mantor summarized the structure of the second transaction as follows: (1) Heimdal would purchase

[*12] Lausanne's interest in CG for a note to be negotiated of no more than $5 million with interest only for seven years; (2) Lausanne would be given an "equity kicker" of no more than 50% of the remaining annual distribution from CG; and (3) Lausanne would also be given an option to purchase the interest back from Heimdal if certain further development of the geothermal properties were to occur. As a result of this transaction, Mantor believed that Heimdal would have high deductible interest expenses which would partially reduce its taxable income in the United States. He also believed that Heimdal's remaining income would be reduced by the use of the NOLs in AMC. Attached to Mantor's fax was a copy of Pfaff's December 11, 1992, letter.

The Letter Agreement and the Promissory Note

On December 31, 1992, the parties signed a written letter agreement whereby Heimdal agreed to purchase Lausanne's three partnership units (referred to as "Units" in the agreement) in CG (referred to as "Partnership") for a purchase price of $5 million, payable with a promissory note (referred to as "Note").

The letter agreement included the following relevant terms:

(4)(f) without * * * [Lausanne's] prior written consent, (which * * * [Lausanne] may withhold in * * * [its] sole and absolute discretion) * * * [Heimdal] will not (i) liquidate, (ii) merge or consolidate with any other entity, (iii) sell all or substantially all of its assets, (iv) enter into or engage in any business other than ownership of the Units, (v)

[*13] enter into any guarantees or pledge any of * * * [its] assets other than liabilities in the ordinary course of business not exceeding an aggregate of $100,000 in any year and liabilities in * * * [Lausanne's] favor. * * *

(7) * * * [Heimdal] undertake[s] to cause the Partnership to deliver to * * * [Lausanne] copies (for so long as the Note remains outstanding) of all notices and correspondence which are sent to * * * [Heimdal] are generally distributed by the Partnership to its limited partners at the same time such materials are sent or distributed. In the event the Partnership fails to timely deliver such materials to * * * [Lausanne], * * * [Heimdal] will immediately send * * * [Lausanne] copies thereof. In addition, for so long as the Note remains outstanding * * * [Heimdal] shall provide * * * [Lausanne] with access to all books and records pertaining to the Units.

(8) In the event it is proposed that the limited partners make any capital contribution to the Partnership in respect of their units, * * * [Lausanne] and * * * [Heimdal] agree to consider in good faith whether the Cash Flow Interest provisions of the Note should be modified to reflect the economic effect of such capital contribution.

That same day, Heimdal furnished Lausanne with a $5 million promissory note that was payable on December 31, 2002, as consideration for the transaction.

The promissory note included the following terms:

The principal balance of this Note shall bear interest at the rate of twelve percent (12%) per annum (based on a 360 day year). Such interest shall be payable annually in arrears on December 31, of each year and upon the maturity of the principal hereof (upon the stated maturity hereof, prepayment, acceleration or otherwise); provided however, that upon Payor receiving any distribution from * * * the Partnership * * * with respect to the three (3) * * * Units * * * of limited partnership interest in the Partnership purchased as of the date hereof by Payor from Payee, Payor shall apply such distribution to

**[*14]** pay (or prepay) any interest accrued (or which shall thereafter accrue during the then current calendar year) hereunder.

In addition to the 12% interest described above, additional interest ("Cash Flow Interest") equal to fifty percent (50%) of the excess, if any, of (i) distributions paid by the Partnership in any calendar year over (ii) the sum of (A) six hundred thousand dollars ($600,000) and (B) the reasonable costs of collection of such distributions, if any, shall be due and payable by Payor to Payee immediately upon receipt of any such distribution which represents, in whole or in part, any such excess.

Any principal or interest (including Cash Flow Interest) not paid when due hereunder shall bear at a rate of 16% per annum.

Payor shall not prepay the principal amount of this Note without the prior written consent of Payee (which may be withheld in Payee's sole and absolute discretion).

This Note is entitled to the benefits of the Security Agreement of even date herewith between Payor, as debtor, and Payee, as secured party (the "Security Agreement") * * *

The transfer of this Note (which as provided in the Payee's Note may only occur with the prior written consent of Payor) is registerable on the note registry maintained by Payor, upon surrender of this Note for registration of transfer at the address of Payor * * *, duly endorsed by, or accompanied by a written instrument of transfer and duly executed by the holder or its attorney, duly authorized in writing, and thereupon a new note in the same principal amount will be issued by Payor to the designated transferee.

Each of the following events shall constitute an Event of Default hereunder:

**[*15]** (a) if any portion of the principal, interest or other amounts payable by Payor under this Note is not paid within five (5) days after the same is due;

(b) if Payor violates or does not comply with any of the provisions of this Note * * * [or] the Letter Agreement; * * *

(d) if Payor shall make an assignment for the benefit of creditors; * * *

(f) if the Partnership shall sell all or substantially all of its properties or liquidate; or

(g) if any Event of Default (as defined in the Security Agreement) shall occur.

Upon the occurrence at any time of any of the foregoing Events of Default, (i) Payee may, by written notice to the Payor, declare the outstanding balance of the principal and interest payable hereunder to be immediately due and payable, upon which declaration such principal and interest shall be immediately due and payable * * *

Notwithstanding anything to the contrary contained in this Note or in any other instruments or documents executed and delivered in connection herewith, in no event shall the total of all charges payable under this Note which are or could be held to be in the nature of interest, exceed the maximum rate permitted to be charged by applicable law of the State of New York. Should payee receive any payment which is or would be in excess of that permitted to be charged under any such applicable law, such payment shall have been, and shall conclusively be deemed to have been, made in error and shall automatically thereupon be applied to reduce the unpaid principal amount then outstanding on this Note. This provision shall control interpretation of any other conflicting provisions in this Note and any other instruments or documents executed and delivered in connection herewith or therewith with respect to the payment of interest. * * *

**[*16]**This Note may not be waived, changed, modified, terminated or discharged orally, but only by agreement in writing signed by the holder hereof.

Pfaff's Memorandum of Advice to T. Rinderknecht

On February 11, 1993, Pfaff mailed a letter to T. Rinderknecht, copying Mantor, that included a memorandum of advice concerning the tax consequences of the transaction between Heimdal and Lausanne. The memorandum explained that the transaction was effected as had been outlined in Pfaff's December 11, 1992, letter, with the modification that the sale was made to Heimdal instead of Norse Services, and that the promissory note was for a term of 10 years rather than "no more than seven years." Pfaff's memorandum concluded that the transfer of the CG units from Lausanne to Heimdal could be treated as an installment sale and that withholding on the disposition of a U.S. real property interest would therefore be required when Heimdal made a principal payment to Lausanne. Pfaff also observed that the note included a provision whereby cashflow interest on the note was limited to the maximum allowable interest under New York State law and concluded that this provision would be sufficient to classify these payments as interest payments rather than additional principal payments.

The memorandum also informed T. Rinderknecht and Mantor that U.S. interest paid by a U.S. entity to a foreign corporation is generally subject to 30%

[*17] tax under section 881 and withholding under section 1442, but portfolio interest is exempt from U.S. tax under section 881(c). Pfaff explained that in order to meet the portfolio interest exception, Heimdal had to receive a Form W-8, Certificate of Foreign Status, from Lausanne before making payment, attach the completed Form W-8 with Form 1042-S, Foreign Person's U.S. Source Income Subject to Withholding, to Form 1042, Annual Withholding Tax Return for U.S. Source Income of Foreign Persons, and file Form 1042 with the Internal Revenue Service by March 15 following the calendar year of the payment. The memorandum stated that Form W-8 would be valid for three years but could be requested annually or before each payment. The memorandum concluded that the note "appears to be registered, and will meet the portfolio interest exception of section 881(c) if the payor receives a statement that the beneficial owner of the obligation is not a United States person." The memorandum was not a full tax opinion letter subject to prior review with the KPMG Washington national office.

Modifications to the Promissory Note

On December 31, 2002, Heimdal and Lausanne extended the term of the note to December 31, 2005 (2002 extension). All other terms and conditions of the note, including those with respect to fixed interest and cashflow interest, were

[*18] incorporated in the 2002 extension and remained in full force and effect during the term of the 2002 extension.

On October 28, 2004, Heimdal and Lausanne amended the promissory note agreement to state that Heimdal would accrue, rather than pay up front, the fixed interest of $600,000 for each of 2003, 2004, 2005. The amendment occurred after Heimdal had received distributions from CG in 2003 that were less than the $600,000 fixed interest payment due to Lausanne for that year.

On December 22, 2005, Heimdal and Lausanne extended the term of the note to December 31, 2006 (2005 extension). The 2005 extension provided that certain other terms and conditions of the note, including the fixed rate of interest and the rate of cashflow interest, would be renegotiated in good faith but provided that should the parties not agree on revised terms, the existing terms of the 2002 extension would remain in full force and effect.

Finally, on December 26, 2006, Heimdal and Lausanne extended the term of the note to December 31, 2009 (2006 extension). As part of the 2006 extension, Heimdal and Lausanne agreed to reduce the fixed interest rate portion of the agreement from 12% to 6% and prohibit prepayment of the principal. During the period covered by the 2006 extension, Heimdal continued to pay fixed interest to Lausanne at the rate of 12% rather than the reduced rate of 6%.

[*19] On January 29, 2008, Heimdal prepaid the $5 million principal amount of the note to Lausanne.

CG's Investor Relations Report and Heimdal's Profit and Loss Statements

CG's Investor Relations report states that from December 31, 1992, through March 31, 2009, Heimdal received distributions of approximately $35.6 million from CG. Heimdal reported on its profit and loss statements that it had remitted approximately $22.7 million to Lausanne as interest payments during this period. In 2007 alone Heimdal received distributions from CG totaling $14,170,452. For that year Heimdal reported that it had remitted approximately $7,229,930 to Lausanne as interest payments. Heimdal's profit and loss statements for 1993-2007 showed that it had received "consulting income" totaling $923,473.67 in 2004-07. Presumably, Heimdal had received the "consulting income" in violation of the letter agreement between Heimdal and Lausanne, which prohibited Heimdal from engaging in any business other than ownership of the CG units without Lausanne's prior written consent.

Tax Reporting

For 1993-2008, Heimdal did not file Forms 1042 or Forms 1042-S. In these same years Heimdal did not deposit or pay any withholding tax on distributions it made to Lausanne. The record shows that Lausanne sent Heimdal one completed

**[\*20]** Form W-8 dated December 31, 1992, certifying that Lausanne was not a U.S. citizen or resident.

## OPINION

### I.     Burden of Proof

Generally, the taxpayer has the burden of proving that the determinations in the notice of deficiency are incorrect. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). We resolve these issues on the preponderance of the evidence in the record. See Estate of Bongard v. Commissioner, 124 T.C. 95, 111 (2005).

### II.    The Tax Implications of the Transaction Between Heimdal and Lausanne

Section 881(a)(1) generally imposes a tax of 30% on "fixed or determinable annual or periodical" (FDAP) income received from sources within the United States by a foreign corporation if the income is not effectively connected with the conduct of a United States trade or business. This tax may be reduced under a bilateral income tax treaty between the United States and the foreign corporation's country of residence. See sec. 894(a)(1). Because the transaction in these cases involves Heimdal, a domestic entity, and Lausanne, an entity incorporated in a country that does not have a tax treaty with the United States, we look to the Code for the rules governing the transaction.

**[*21]** The Code defines FDAP income broadly and includes in it income from interest payments. See Commissioner v. Wodehouse, 337 U.S. 369, 393-394 (1949). The U.S. payors of such income are generally required under sections 1441 and 1442 to deduct and withhold therefrom an amount equal to the tax imposed by sections 871 and 881, and in the event that they fail to do so they are liable for those withholding taxes under section 1461.

In 1984, Congress repealed the 30% withholding tax imposed by sections 871 and 881 with respect to certain interest paid on portfolio debt, referred to as "portfolio interest". For the most part, and as relevant here, portfolio interest refers to interest payments made to a foreign corporation (owning less than 10% of the payor entity) pursuant to debt obligations that are either in registered form with the appropriate certification or sold exclusively to non-U.S. persons with proper precautions taken that such debt obligations will not be held by U.S. persons. See secs. 881(c), 163(f)(2)(B).

The remaining issues in these two cases turn on whether the transaction between Heimdal and Lausanne generated bona fide portfolio interest payments for tax purposes from the former to the latter. If the disbursements were bona fide for tax purposes, the Norse Group would be able to deduct the payments on its 2007 consolidated tax return. As a result no penalty would be imposed on the

**[\*22]** Norse Group for including this large deduction on its 2007 return. Furthermore, Heimdal would not have to withhold tax on behalf of Lausanne for the years in issue--provided certain formalities were met--and no additions to tax would be imposed for its failure to do so.

Before we decide whether Heimdal's payments to Lausanne meet the reporting requirements for it to claim the portfolio interest exemption from withholding, we must first decide whether Heimdal's payments were genuine interest payments.

A.     Bona Fide Debt

The question of whether Heimdal's payments to Lausanne were bona fide interest payments is a factual question to be decided on the basis of all of the relevant facts and circumstances.  See Haber v. Commissioner, 52 T.C. 255, 266 (1969), aff'd, 422 F.2d 198 (5th Cir. 1970); Roschuni v. Commissioner, 29 T.C. 1193, 1201-1202 (1958), aff'd, 271 F.2d 267 (5th Cir. 1959).  For a promissory note to constitute bona fide indebtedness, there must be an unconditional legally enforceable obligation to pay the money.  Horn v. Commissioner, 90 T.C. 908, 938 (1988).  The "simple expedient of drawing up papers" is not controlling for tax purposes when "the objective economic realties are to the contrary."  Frank Lyon Co. v. United States, 435 U.S. 561, 573 (1978).

**[\*23]** The U.S. Court of Appeals for the Fifth Circuit has identified nonexclusive factors to be considered in distinguishing bona fide indebtedness from an equity investment or other return on capital.  See Estate of Mixon v. United States, 464 F.2d 394, 402 (5th Cir. 1972).  Some of these factors are as follows:  (1) the names given to the certificate evidencing the indebtedness; (2) the presence or absence of a fixed maturity date; (3) the source of the funds used to pay interest and repay the creditor; (4) the right to enforce the payment of principal and interest; (5) the extent of a creditor's participation in management; (6) the status of the advance in relation to other corporate creditors; (7) the intent of the parties; (8) thinness of capital structure in relation to the debt; (9) identity of interest between creditor and stockholder; (10) the debtor's ability to obtain loans from outside lending institutions; (11) the extent to which the advance was used to acquire capital assets; and (12) the failure of the debtor to pay on the due date or to seek a postponement.  See id.; In re Indian Lake Estates, Inc., 448 F.2d 574, 578-579 (5th Cir. 1971); PK Ventures, Inc. v. Commissioner, T.C. Memo. 2006-36, aff'd in part, rev'd in part on other grounds, and remanded sub nom. Rose v. Commissioner, 311 F. App'x 196 (11th Cir. 2008).

The identified factors are not equally significant, and no single factor is determinative in each case or relevant in every case.  See Jones v. United States,

**[\*24]** 659 F.2d 618, 622 (5th Cir. 1981); Calumet Indus., Inc. v. Commissioner, 95 T.C. 257, 285 (1990). The real issue for tax purposes has long been held to be the extent to which the transaction complies with arm's length standards and normal business practice. Estate of Mixon, 464 F.2d at 403. The various factors are only aids in answering the ultimate question of whether there was "a genuine intention to create a debt, with a reasonable expectation of repayment, and did that intention comport with the economic reality of creating a debtor-creditor relationship?'" Litton Bus. Sys., Inc. v. Commissioner, 61 T.C. 367, 377 (1973); see also Calumet Indus., Inc. v. Commissioner, 95 T.C. at 285-286; Dixie Dairies Corp. v. Commissioner, 74 T.C. 476, 494 (1980). The form of the transaction and the labels the parties place on the transaction may not have as much significance when the parties can mold the transaction at their will. Calumet Indus., Inc. v. Commissioner, 95 T.C. at 286. The Internal Revenue Service recently released proposed regulations in an attempt to bring clarity and consistency to the analysis of distinguishing between indebtedness and equity investments. See Notice of Proposed Rulemaking, 81 Fed. Reg. 20912 (Apr. 8, 2016). Because the transaction at issue in these cases took place more than 20 years ago, we mention these regulations for posterity's sake only.

**[*25]** Applying the above factors we find that the advance of the purchase price of the three CG partnership units from Lausanne to Heimdal was not a bona fide loan but an equity investment. The Norse Group and Lausanne worked together to create a transaction that reduced their respective tax liabilities, rather than create a strict debtor-creditor relationship, and this was their sole objective.

The Norse Group may have established the existence of a formal debt instrument with a fixed maturity date at the outset, but it did not establish that any of the note's terms were properly negotiated. The terms of the promissory note were largely based on Pfaff's December 11, 1992, letter, which proposed a $5 million dollar note that provided for 12% fixed interest and additional cashflow interest. Pfaff recommended that Heimdal and Lausanne obtain a valuation of the CG partnership units before their sale so that they could show that they were dealing at arm's length, but they did not obtain one. Furthermore, Pfaff stated at trial that he did not know how the 12% fixed interest rate was devised. An asset's sale price may be considered to be at arm's length where each party in the transaction can "distinguish his economic interest from that of the other party and, where they conflict, always choose that to his individual benefit." See Creme Mfg. Co. v. United States, 492 F.2d 515, 520 (5th Cir. 1974). Here, that simply did not occur. Nothing in the record suggests that these terms were negotiated.

[*26] Although the note had a 10-year fixed maturity date at the outset of the transaction, that maturity had to be postponed for 7 years because Heimdal did not have sufficient cashflow stemming from the CG distributions to repay the note on time. The repayment of the debt was strictly contingent upon the success of the CG partnership units to generate income, suggesting equity classification. See Slappey Drive Indus. Park v. United States, 561 F.2d 572, 582-583 (5th Cir. 1977).

As a condition to the transfer of the three CG partnership units to Heimdal, Lausanne obtained the right to approve of Heimdal's business activities and debts and precluded Heimdal from engaging in any other business activities and incurring any other debt. When an entity advances funds for the right to participate in the management of the debtor's business, the advance may not be intended as bona fide debt and instead may be intended as an equity investment. See Am. Offshore, Inc. v. Commissioner, 97 T.C. 579, 603 (1991). Under the restrictive terms of the letter agreement, Lausanne effectively managed Heimdal.

The Norse Group places great weight on its professed intent to enter into a debtor-creditor relationship with Lausanne and its reflection of the debt as such in its and Lausanne's books, records, and tax returns. The intent of the parties weighs heavily in determining the debt versus equity question, but subjective

**[*27]** intent does not suffice to alter the relationship or duties created by an otherwise objectively indicated intent. In re Lane, 742 F.2d 1311, 1316 (11th Cir. 1984). Conclusory and self-serving statements by taxpayers that they intended to create debts have been accorded little weight by the courts. The Court of Appeals for the Fifth Circuit has stated: "Primary reliance upon subjective indications of intent is simply not an effective way of resolving * * * [the debt versus equity] problem. In a land of hard economic facts, we cannot root important decisions in parties' pious declarations of intent." Tex. Farm Bureau v. United States, 725 F.2d 307, 314 (5th Cir. 1984).

Thus, we must look not simply at the pronouncements of the parties but also at the circumstances surrounding the transaction to reveal their intent. Tyler v. Tomlinson, 414 F.2d 844, 850 (5th Cir. 1969). The circumstances surrounding Lausanne's transfer of its three CG partnership units to Heimdal reveal that they did not intend to enter into a debtor-creditor relationship.

In late 1991, it became apparent that Lausanne might be liable for the branch profits tax as its ownership of the CG units was becoming profitable around that time. Rather than try to address this issue using its own business exigencies, it worked in conjunction with the Norse Group to find a mutually compatible way to lower both companies' tax burdens. In late 1991 and

[*28] throughout 1992, Mantor and T. Rinderknecht regularly corresponded with one another regarding the transaction.

Meanwhile, the Norse Group reached out to its own tax adviser, Pfaff, regarding the transaction. Mantor would ask for Pfaff's advice regarding certain aspects of the deal, and he would pass along Pfaff's advice to T. Rinderknecht. Mantor's correspondence with Pfaff was not necessarily as concerned with the Norse Group's sole business or tax consequences regarding the deal as it was with the Norse Group's and Lausanne's tax consequences together. At some point Pfaff started to communicate directly with T. Rinderknecht regarding the salient terms of the deal. These discussions suggest that the Norse Group's and Lausanne's dealings were not at arm's length. See Creme Mfg. Co., 492 F.2d at 520 (noting that a transaction is not at arm's length if each party is not in a position to distinguish its own economic interests from the other's).

The parties continued to act in concert with one another to devise a seller-financed purchase of the CG partnership units that was mutually beneficial to the Norse Group and Lausanne. In the months leading up to the transaction, Mantor created a cashflow analysis for the Norse Group that analyzed the contemplated transaction. In this analysis Mantor considered the tax ramifications to both the Norse Group and Lausanne. He was able to consider Lausanne's tax implications

[*29] because he had its financial data from a previous agreement. His concern over the tax aspects for Lausanne implies that the Norse Group was not primarily concerned with its own business interests but, instead, with creating a mutually beneficial arrangement with Lausanne. Thus, the Norse Group and Lausanne's ability to mold the transaction to their collective will diminishes any significance that the transaction's form and labels may have held as determinants of bona fide debt. See Calumet Indus., Inc. v. Commissioner, 95 T.C. at 286.

The Norse Group admits that the source of the repayment of its debt to Lausanne was the CG partnership distributions it purchased from Lausanne. Heimdal had no assets at the time it entered into the transaction to purchase the CG partnership units, and it required an advance of the entire purchase price from Lausanne. This fact strongly suggests that Lausanne's advance to Heimdal was equity rather than debt. See United States v. Henderson, 375 F.2d 36, 40 (5th Cir. 1967).

Moreover, Heimdal's and Lausanne's conduct while the note was enforceable indicates that they did not consider the note to be genuine indebtedness. Heimdal violated the terms of the letter agreement by failing to pay interest timely in 2003 and 2004. Rather than treat the note as defaulted on, however, Lausanne allowed Heimdal to accrue interest and continue holding the

[*30] CG units for several years after the original maturity date. Furthermore, the 2006 extension reduced the fixed interest rate from 12% to 6%, yet in 2007, Heimdal paid Lausanne fixed interest at the higher 12% rate. Where a debtor does not make required payments or a creditor does not enforce its right to receive payments, an advance appears more like equity than debt. Ambassador Apartments, Inc. v. Commissioner, 50 T.C. 236, 246 (1968), aff'd, 406 F.2d 288 (2d Cir. 1969).

In the end the Norse Group and Lausanne devised a transaction whereby Lausanne would sell the CG partnership units in exchange for a promissory note from Heimdal that generated interest payments to Lausanne. The terms of the agreement prevented Heimdal from engaging in any business other than holding the CG units and provided Lausanne with access to Heimdal's books and records pertaining to the CG units. Because some portion of the interest payments was contingent on the performance of CG, Lausanne would still generate income from CG without having to pay the branch profits tax. They anticipated that a portion of the interest could be classified as portfolio interest (provided the legal formalities were met). Therefore, Heimdal could claim interest deductions on the interest payments and offset the income generated by its new ownership of the CG units with the NOLs of the Norse Group. In substance the economics of the

[*31] transaction remained the same--Lausanne generated income from the CG units and had substantial control over the units themselves. The expected extra benefit was that both Lausanne and the Norse Group received large tax advantages for having the transaction structured in this way.

In Frank Lyon Co., 435 U.S. at 583-584, the Supreme Court stated that "a genuine multiple-party transaction with economic substance * * * compelled or encouraged by business or regulatory realities, * * * imbued with tax-independent considerations, and * * * not shaped solely by tax-avoidance features" should be respected for tax purposes. Many cases demonstrate the difference between arranging a contemplated business transaction in a tax-advantaged manner, which is legitimate, and entering into a prearranged transaction designed solely to use preserved NOLs and create a tax benefit, which is not. See, e.g., Stobie Creek Invs., LLC v. United States, 608 F.3d 1366, 1375 (Fed. Cir. 2010); Coltec Indus., Inc. v. United States, 454 F.3d 1340, 1357 (Fed. Cir. 2006); Vulcan Materials Co. v. United States, 446 F.2d 690, 699-700 (5th Cir. 1971). We believe Mantor and T. Rinderknecht, with the approval of Roed, created this transaction solely to generate a tax benefit. The Norse Group and Lausanne designed and implemented this elaborate system to create the appearance that Heimdal was paying interest, while in substance it was not. Therefore, the payments were not deductible by the

[*32] Norse Group, and they were FDAP income, which required Heimdal to withhold income tax.

      B.      <u>Reporting Requirements To Meet the Portfolio Interest Exemption</u>

Although we find that the Norse Group did not really pay interest to Lausanne for purposes of section 881(c), an alternative ground for decision is that Heimdal did not meet the reporting requirements to satisfy the portfolio interest exemption.

In order for a debtor paying interest on registered debt to a foreign corporation to claim the portfolio interest exemption, and thus not be subject to withholding procedures, it generally must receive a statement that the beneficial owner of the registered obligation is not a U.S. person. <u>See</u> secs. 871(h)(5), 881(c)(2)(B); sec. 1.881-2(a)(6), Income Tax Regs. (referring to section 1.871-14, Income Tax Regs., for rules applicable to a foreign corporation's receipt of interest on certain portfolio debt instruments); sec. 1.871-14(c)(1)(ii), Income Tax Regs. (applicable to interest payments made after December 31, 2000). A debtor that does not have a beneficial ownership statement before the interest payment must rely on presumption rules in the regulations to determine whether to withhold under section 1442. <u>See</u> sec. 1.871-14(c)(3)(i), Income Tax Regs. (applicable to interest payments made after December 31, 2000); sec. 1.1442-1, Income Tax

[*33] Regs. (referring to sections 1.1441-1 through 1.1441-9, Income Tax Regs., for rules concerning the withholding of tax at the source in the case of foreign corporations); sec. 1.1441-1(b)(7)(i), Income Tax Regs. (applicable to interest payments made after December 31, 2000).

For interest payments made in tax years 1995-2000, this statement must be signed by the beneficial owner under penalty of perjury and provide the name and address of the beneficial owner. Sec. 35a.9999-5(b), Q&A-9, Temporary Income Tax Regs., 49 Fed. Reg. 33242 (Aug. 22, 1984). For interest payments made after December 31, 2000, this statement has the added requirement that it must be provided every three years during the period in which the beneficial owner owns the obligation. See secs. 871(h)(5), 881(c)(2)(B); sec. 1.871-14(e)(4)(ii), Income Tax Regs.

A properly completed Form W-8 will satisfy the requirements under section 871(h)(5). See sec. 35a.9999-5(b), Q&A-9, Temporary Income Tax Regs., supra; secs. 1.871-14(c)(2)(i), 1.1441-1(e)(1)(ii)(1), (2)(ii), Income Tax Regs. For interest payments made in tax years 1995-2000, the Form W-8 must be received by the payor in the calendar year in which the payment is made or collected or in either of the preceding two calendar years. Sec. 35a.9999-5(b), Q&A-9, Temporary Income Tax Regs., supra; sec. 1.6049-5(b)(2)(iv), Income Tax Regs.

[*34] For interest payments made after December 31, 2000, the Form W-8 must be provided before the expiration of the beneficial owner's period of limitation for claiming a refund of tax on such interest. See sec. 1.871-14(c)(3)(i) and (ii), Income Tax Regs. In these cases a Form W-8 had to be provided before the expiration of Lausanne's period of limitation for claiming a refund in order for the interest to qualify as portfolio interest.

The parties agree that the promissory note purported to be a debt obligation and was in registered form. The parties do not argue that the presumption rules in the regulations permit Heimdal to avoid withholding obligations under section 1442. Therefore, for interest payments on the note to be classified as portfolio interest, Heimdal must have received a statement from Lausanne stating that Lausanne is not a U.S. person. Heimdal received only one proper Form W-8 from Lausanne that was issued in 1992. This statement of beneficial ownership would have been effective only during taxable years 1992-94. See 35a.9999-5(b), Q&A-9, Temporary Income Tax Regs., supra; sec. 1.6049-5(b)(2)(iv), Income Tax Regs.

Heimdal also provided an unsigned Form W-8ECI, Certificate of Foreign Person's Claim That Income Is Effectively Connected With the Conduct of a Trade or Business in the United States. Irrespective of whether the Form W-8ECI has any impact on these cases, the regulations state that a beneficial ownership

[*35] form is valid only if it is signed under penalty of perjury by the beneficial owner, in these cases Lausanne. Therefore, we cannot rely on this document as a statement of beneficial ownership.

Finally, Lausanne's period of limitation for claiming a refund for any of the years in issue has expired. See sec. 6511(a) (providing that the period of limitation for claiming a refund is generally within three years from the time the return was filed or two years from the time the tax was paid, whichever period expires later). Therefore, the time for Heimdal to receive a proper beneficial ownership statement has run out. Thus, for the years in issue, Heimdal did not satisfy the reporting requirement for claiming the portfolio interest exemption.

C.    Conclusion

In conclusion we hold that Heimdal's payments to Lausanne were not bona fide interest payments. Therefore, the Norse Group is not entitled to deduct a purported interest expense of $7,229,930 for the 2007 tax year, and Heimdal is liable for a 30% withholding tax on the gross amount of distributions it made to Lausanne for the years in issue.

III.    Penalty and Additions to Tax

Respondent determined that the Norse Group is liable for the section 6662(a) accuracy-related penalty on its underpayment for the 2007 tax year.

[*36] Respondent also determined that Heimdal is liable for additions to tax under sections 6651(a)(1) and (2) and 6656 for tax years 1995-2008. Respondent now concedes that Heimdal is not liable for the section 6651(a)(2) additions to tax.

A.     The Norse Group

Section 6662(a) and (b)(2) imposes a 20% accuracy-related penalty on any underpayment of Federal income tax which is attributable to a substantial understatement of income tax. In the case of a corporation (other than an S corporation or a personal holding company), an understatement of income tax is substantial if it exceeds the lesser of 10% of the tax required to be shown on the return (or, if greater, $10,000) or $10 million. Sec. 6662(d)(1)(B). The Norse Group, as a corporate taxpayer, bears the burden of proving that it is not liable for an accuracy-related penalty pursuant to section 6662(a). See NT, Inc. v. Commissioner, 126 T.C. 191, 195 (2006).

The taxpayer must come forward with persuasive evidence that the penalty is inappropriate because, for example, the taxpayer acted with reasonable cause and in good faith. Sec. 6664(c)(1); Higbee v. Commissioner, 116 T.C. at 448-449. The decision as to whether a taxpayer acted with reasonable cause and in good faith is made on a case-by-case basis, taking into account all of the pertinent facts and circumstances. See sec. 1.6664-4(b)(1), Income Tax Regs.

[*37] Reliance on the advice of a tax professional may, but does not necessarily, establish reasonable cause and good faith for the purpose of avoiding a section 6662(a) penalty.  United States v. Boyle, 469 U.S. 241, 251 (1985) ("Reliance by a lay person on a lawyer [or an accountant] is of course common; but that reliance cannot function as a substitute for compliance with an unambiguous statute."). That petitioners had an accountant prepare their returns does not, in and of itself, prove that they acted with reasonable cause and in good faith.  See Neonatology Assocs., P.A. v. Commissioner, 115 T.C. 43, 99-100 (2000), aff'd, 299 F.3d 221 (3d Cir. 2002).

Caselaw sets forth the following three requirements in order for a taxpayer to use reliance on a tax professional to avoid liability for a section 6662(a) penalty:  "(1) The adviser was a competent professional who had sufficient expertise to justify reliance, (2) the taxpayer provided necessary and accurate information to the adviser, and (3) the taxpayer actually relied in good faith on the adviser's judgment."  See id. at 99; see also Charlotte's Office Boutique, Inc. v. Commissioner, 425 F.3d 1203, 1212 n.8 (9th Cir. 2005) (quoting with approval the above three-prong test), aff'g 121 T.C. 89 (2003).  In addition, the advice must not be based on unreasonable factual or legal assumptions (including assumptions as to future events) and must not unreasonably rely on the representations,

**[\*38]** statements, findings, or agreements of the taxpayer or any other person. Sec. 1.6664-4(c)(1)(ii), Income Tax Regs.

The Norse Group reported tax of $1,817,192 on its 2007 return while it was required to show tax of $5,578,506, notwithstanding certain deductions. This understatement exceeds $557,850 (10% of the required tax to be shown on Norse Group's return), an amount which is the lesser of $10 million (and the greater of $10,000). Therefore, the understatement of income tax was substantial.

The Norse Group argues that it had substantial authority for its position to treat its disbursements to Lausanne as interest payments. It also argues that it acted with reasonable cause and in good faith with respect to this position because it relied on Pfaff's advice.

As explained above, the arguments the Norse Group offered to show support for its position are not adequately supported by the caselaw and do not show substantial authority. See sec. 1.6662-4(d)(2) and (3), Income Tax Regs. The position the Norse Group took on its 2007 tax return was a gamble at best as the weight of the authorities supporting its treatment of the disbursements to Lausanne as interest payments was slim to none while the weight of the authorities supporting contrary treatment was abundant. See id.

[*39] Furthermore, the Norse Group's argument that it relied on the advice of a competent tax professional is not persuasive. While Pfaff assisted in the development of the transaction between Heimdal and Lausanne, the Norse Group failed to follow his recommendations of obtaining a valuation of the CG units or filing the requisite forms to claim the portfolio interest exemption. Additionally, Pfaff's suggestions were informal and not up to the strict standards of his firm's opinion letters on which clients could reasonably rely. Heimdal and Lausanne simply took Pfaff's recommendations for the design of the transaction at face value without negotiating the terms. When it came time for Pfaff to write a memorandum of advice regarding the transaction, it was unclear whether Pfaff's memorandum was directed towards the Norse Group, Lausanne, or both. Pfaff's multiple correspondence with both the Norse Group and Lausanne shows that the Norse Group did not use his advice so much for properly assessing their tax liability as they did for entering into a transaction for pure tax-avoidance purposes. We conclude that the Norse Group did not act with reasonable cause and in good faith in deducting its disbursements to Lausanne as interest payments for 2007.

    B.    <u>Heimdal</u>

Section 6651(a)(1) provides for an addition to tax of 5% of the tax required to be shown on the return for each month or fraction thereof for which there is a

[*40] failure to file, not to exceed 25%. However, the addition to tax for failure to file is not imposed if it is shown that the failure to file did not result from willful neglect and was due to reasonable cause. See Boyle, 469 U.S. at 245. To prove reasonable cause, the taxpayer must show that he exercised ordinary business care and prudence but nevertheless could not file the return when it was due. See Crocker v. Commissioner, 92 T.C. 899, 913 (1989); sec. 301.6651-1(c)(1), Proced. & Admin. Regs.

Section 6656 imposes an addition to tax equal to 10% of the portion of an underpayment in withholding tax that is required to be deposited if the failure to deposit extends more than 15 days. A taxpayer may also avoid the addition to tax under section 6656 if its failure to deposit was due to reasonable cause and not willful neglect. Charlotte's Office Boutique, Inc. v. Commissioner, 121 T.C. at 109.

It is undisputed that Heimdal filed no withholding tax returns (Forms 1042) and deposited no withholding taxes with the Treasury. Heimdal argues that its failure to file Forms 1042 was due to reasonable cause because: (1) its very obligation to file the returns is the issue being litigated in these cases, and (2) it reasonably relied on the advice of a competent tax professional who informed Heimdal that it had no withholding obligation. This argument fails.

**[*41]** There is no evidence that Heimdal was told that it need not file Forms 1042. In fact, there is evidence to the contrary. Pfaff specifically told Heimdal that its disbursements to Lausanne would be subject to withholding taxes if Heimdal failed to receive a Form W-8 from Lausanne every three years and failed to attach each Form W-8 with Form 1042-S to Form 1042. Heimdal did not follow this important advice. Therefore, Heimdal cannot show that it acted with reasonable cause and in good faith. Accordingly, we sustain respondent's determination that Heimdal is liable for additions to tax and penalties for tax years 1995-2008.

We have considered all the other arguments made by the parties, and to the extent not discussed above, find those arguments to be irrelevant, moot, or without merit.

To reflect the foregoing,

<u>Decisions will be entered</u>

<u>under Rule 155</u>.